PRESSED STEEL CAR CO. v. EASTERN RY. CO. OF MINNESOTA.

EASTERN RY. CO. OF MINNESOTA v. PRESSED STEEL CAR CO.

(Circuit Court of Appeals, Eighth Circuit. March 23, 1903.)

Nos. 1,802, 1,803.

**1.** CONSTRUCTION OF CONTRACTS—INTENTION OF PARTIES THE DESIDERATUM.

The sole purpose of the construction of a contract is to ascertain and enforce the intention of the parties—the sense and meaning upon which their minds met when they made it—and when this is discovered it prevails over verbal inaccuracies, inapt expressions, and the dry words of the agreement.

**2.** SAME—INTENTION DEDUCED FROM ENTIRE AGREEMENT.

The intention of the parties must be deduced from the entire agreement, and not from any part or parts of it, because, where a contract has several stipulations, it is plain that the parties agreed that their intention was not expressed by any single part or stipulation of it, but by every part and provision in it, considered together, and so construed as to be consistent with every other part.

**3.** SAME.

Where the language of a contract is obscure or ambiguous, or its meaning is doubtful, so that it is susceptible of two constructions, that interpretation which evolves the more usual, reasonable, and probable contract should be adopted.

**4.** SAME—FACTS AND CONSTRUCTION IN THIS CASE.

A car company agreed to make and deliver 400 cars to a railway company on or before April 1, 1900, subject to delays from unavoidable contingencies, but that, if it failed to deliver the cars within "the time specified," it would forfeit and pay to the railway company, as liquidated damages, $5 per day for every car so delayed.

*Held*, "the time specified," in the damage clause, meant all the time specified for the delivery of the cars in the earlier part of the contract (that is to say, the time on or before April 1, 1900, plus the time during which the delivery might be delayed by the unavoidable contingencies), and the car company was not liable for the stipulated damages during that time.

**5.** SAME—LIQUIDATED DAMAGES.

When it is certain that some damages will result from delay in the performance of a contract, when those damages are incapable of exact ascertainment, or are based upon matters that are to a considerable degree uncertain, and when the amount stipulated is not, on the face of the agreement, out of all proportion to the probable loss, a contract to pay a sum certain for each day, week, or other definite period of delay beyond the time fixed by the contract for its fulfillment is a valid and enforceable agreement for the measurement of the damages, and is not a contract for a penalty.

**6.** TIME—COMPUTATION—SUNDAY EXCLUDED WHEN LAST DAY.

When the last day within which a deed is to be performed falls on Sunday, that day is excluded, and the act may be done on the succeeding day.

**7.** SAME—INTERVENING SUNDAYS INCLUDED.

In the computation of rents, interest, damages, or any other amounts, where a day, a week, a month, or any other definite period, is the agreed standard of measurement, every intervening Sunday, as well as every secular day, must be included and counted.

(Syllabus by the Court.)

¶ 5. See Damages, vol. 15, Cent. Dig. §§ 161, 167, 173.

In Error to the Circuit Court of the United States for the District of Minnesota.

These writs of error have been sued out to review the trial of an action brought by the Pressed Steel Car Company, a corporation, against the Eastern Railway Company of Minnesota, another corporation, to recover the unpaid part of the purchase price of 400 steel hopper ore cars, which the car company had made and delivered to the railway company under this contract:

"This agreement, made and entered into this 19th day of December, A. D. 1899, between the Pressed Steel Car Company of Pittsburgh, Pa., party of the first part, and the Eastern Railway Company of Minnesota, party of the second part,

"Witnesseth: that the party of the first part covenants and agrees to and with the party of the second part, to build for the party of the second part four hundred (400) steel hopper ore cars, to be delivered on or before April 1st, 1900, in accordance with the specifications, hereto attached and made a part hereof, and subject to the inspection of a representative of the party of the second part, and to deliver said cars on the tracks of either the P. C. C. & St. L. Ry. or P. & L. E. Railroad, or the P. F., W. & C. Ry. or P. & W. Ry., (our works) without cost to the party of the second part, except the purchase price hereinafter mentioned to be paid by the party of the second part. The delivery of these cars to be subject to delays in delivery of materials to be used in these cars, other than the first party's manufacture, and to strikes, fires, delay of carriers, or other unavoidable contingencies beyond the control of said first party. But it is agreed that in the event of the failure of the party of the first part to make and deliver the cars aforesaid within the time specified, then it shall forfeit and pay to the party of the second part as liquidated damages consequent upon such failure the sum of five dollars per day for each and every car so delayed after the said April 1st, 1900.

"In consideration whereof, the party of the second part covenants and agrees to accept said cars and to pay for the same the sum of eight hundred and seventy-five dollars ($875.00) each, to the party of the first part, such payments to be made in cash on delivery of each lot of one hundred cars.

"It is mutually understood and agreed, by and between the parties hereto that in case any future change or modification is made in said specifications, increasing or decreasing the cost of said cars, or any of them, the party of the first part will make the proper deduction from the above price for any such decreases, and the party of the second part will pay for any such increases."

The plaintiff alleged that the amount of the purchase price remaining unpaid was $151,518.66 and interest. The answer of the defendant was that the plaintiff was so dilatory in delivering the cars that the damages for the delay which were stipulated in the contract amounted to more than the unpaid part of the price of the cars. None of the cars were delivered until May 29, 1900, and the delivery of the cars was not completed until June 28, 1900. The plaintiff alleged that this delay was caused by the unavoidable contingencies specified in the agreement. The court held that the plaintiff was liable for the stipulated damages for delays caused by these contingencies, as well as for delays caused by its own default or negligence, and instructed the jury that the defendant was entitled to damages to the amount of $5 per car for every secular day after April 2, 1900, that the delivery of the cars was delayed. The result was a judgment for the plaintiff for $29,186.26.

The car company complains of the trial because the court charged it with damages for delays in the delivery of the cars caused by the unavoidable contingencies, and the defendant is dissatisfied with the result because it was not allowed $5 per car per day for every Sunday as well as for every secular day that the delivery of the cars was delayed after April 1, 1900.

Jared How and Adrian H. Joline (John S. Ferguson, on the brief), for Pressed Steel Car Co.

W. E. Dodge (M. D. Grover, on the brief), for the Eastern Ry. Co. of Minnesota.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The grave question in this case is whether the Pressed Steel Car Company agreed to pay the railway company the liquidated damages stipulated in the contract during the time it was delayed in delivering its cars by the unavoidable contingencies named in the agreement, and that question must be determined by a fair construction of the contract.

The purpose of a written agreement is to evidence the terms upon which the minds of the parties to it meet when they make it. Hence the true end of all contractual interpretation is to ascertain that intention, and when it is found it prevails over verbal inaccuracies, inapt expressions, and the dry words of the stipulations. The court should, as far as possible, put itself in the place of the parties when their minds met upon the terms of the agreement, and then, from a consideration of the writing itself, its purpose, and the circumstances which conditioned its making, endeavor to ascertain what they intended to agree to do—upon what sense or meaning of the terms they used their minds actually met. Accumulator Co. v. Dubuque St. Ry. Co., 64 Fed. 70, 74, 12 C. C. A. 37, 41, 42; City of Salt Lake v. Smith, 104 Fed. 457, 462, 43 C. C. A. 637, 643; Fitzgerald v. First National Bank, 52 C. C. A. 276, 284, 114 Fed. 474, 482.

The intention of the parties must be deduced from the entire agreement and from all its provisions considered together, because, where a contract has many stipulations, it is plain that the parties understood and agreed that their intention was not expressed by any single part or provision of their agreement, but by every part and stipulation, so construed as to be consistent with every other part and with the entire contract. Jacobs v. Spalding, 71 Wis. 177, 189, 36 N. W. 608; Boardman v. Reed, 6 Pet. 328, 8 L. Ed. 415; Canal Co. v. Hill, 15 Wall. 94, 21 L. Ed. 64; O'Brien v. Miller, 168 U. S. 287, 297, 18 Sup. Ct. 140, 42 L. Ed. 469.

Where the language of an agreement is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that the contract is fairly susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract. Coghlan v. Stetson (C. C.) 19 Fed. 727, 729; Jacobs v. Spalding, 71 Wis. 177, 186, 36 N. W. 608; Russell v. Allerton, 108 N. Y. 288, 292, 15 N. E. 391.

Let us consider the agreement of these parties in the light of these familiar canons of interpretation. The stipulations of the contract

material to the determination of the question before us are that the car company undertook to deliver 400 cars to the railway company—

"On or before April 1st, 1900, * * * subject to delays in the delivery of materials to be used in these cars, other than the first party's manufacture, and to strikes, fires, delay of carriers, or other unavoidable contingencies beyond the control of said first party. But it is agreed that in the event of the failure of the party of the first part to make and deliver the cars aforesaid within the time specified, then it shall forfeit and pay to the party of the second part as liquidated damages consequent upon such failure the sum of five dollars per day for each and every car so delayed after the said April 1st, 1900."

The parties evidently contemplated and provided in this agreement for two classes of delays, those that might be caused by the unavoidable contingencies described in the contract, and those that might result from the default or negligence of the car company. For the purpose of reducing the agreement to its lowest terms and of facilitating the discussion, the former will be termed excusable, and the latter inexcusable, delays; the liquidated damages of $5 per day will be termed demurrage; and it will be assumed that there were both excusable and inexcusable delays in the performance of the contract. The agreement then becomes a contract by the car company to deliver the cars on or before April 1, 1900, subject to excusable delays, and to pay the railway company demurrage for a failure to deliver them within "the time specified"; and the question is, when was "the time specified," within which a failure to deliver subjected the car company to the liquidated damages? Was it the time between the date of the agreement and April 2, 1900, or was it the time between the date of the agreement and the expiration of the postponement of the time of delivery caused by the excusable delays? Counsel for the car company insist that it was the latter, because that, as they say, is the obvious meaning of the terms of the agreement, because the word "so," before "delayed," points in that direction, and because that interpretation makes the agreement equitable and reasonable, while the opposite construction renders it unconscionable and improbable. On the other hand, counsel for the railway company as earnestly contend that the former is the true construction, because, as they insist, that is the evident sense of the plain words of the contract, because when the agreement was made the railway company needed the cars for actual use in the transportation of ore as soon as April 1, 1900, when the season for using them opened, because every day's delay in their delivery entailed a great and irreparable loss upon the railway company, and while it was willing to bind itself to accept the cars after April 1, 1900, during the postponement of delivery by the excusable delays on the condition that the car company would contract to pay demurrage during that time, it would never have made the agreement without such a stipulation, because the word "but," which introduces the stipulation for demurrage and expresses antithesis, and the words "after the said April 1st, 1900," at the close of the damage clause, sustain this view, because it cannot be supposed that the parties contemplated a breach of the contract, and stipulated damages for such a breach, and be-

cause the only "time specified" in the writing was the time on or before April 1, 1900.

To the counsel of each of these parties this contract seems plain and unambiguous, and its meaning certain, and yet it has an entirely different signification to the representatives of each of these corporations. This fact, repeated perusals, and a careful study of the writing present very convincing evidence that its terms are not altogether clear, that they were well calculated to raise this controversy, and that they are susceptible of two constructions. It remains to determine which is the more natural, probable, and rational interpretation.

There is no evidence in the record that either of the two interpretations urged upon our consideration would have deterred either of the parties from entering into the agreement. What they intended to stipulate, what they understood the contract to mean, and what they would have done if their interpretation of it had been different, can be deduced only from the contract itself, the situation of the parties, and the circumstances surrounding them when they made it.

It is undoubtedly true that the railway company expected when it entered into the contract that it would sustain serious losses if the cars were not delivered on or before April 1, 1900, and that it did sustain such losses on account of the excusable delays in delivery. This fact, however, is insufficient to prove that "the time specified," within which a failure to deliver the cars would subject the plaintiff to the liquidated damages, was limited to the time prior to April 2, 1900, because it is met by the equally potent consideration that the car company must have known when the agreement was made that it would be liable to great losses for excusable delays if it agreed to pay damages for such delays after April 1, 1900. In other words, the interest of each of the parties was as great when the contract was made as it is now to obtain the agreement which it now claims that it has secured, and the respective interests of the parties are not determinative of the construction that should be given to the agreement.

Nor is the contention of counsel for the railway company that the presumption is that the parties did not contemplate a breach of the contract, and hence that the demurrage must have been provided for the excusable as well as for the inexcusable delays, persuasive, because the demurrage clause is, in essence, a stipulation for the measurement of possible damages; because damages are indemnity for the breach of a contract or of a duty; because stipulations to liquidate possible damages for delays in the fulfillment of contracts for construction and manufacture, for the purpose of securing their prompt performance, are customary, and in such contracts the presumption and the practice are to anticipate and make provision for a possible failure of the contractor or manufacturer in the prompt performance of his work. 1 Sutherland on Damages (2d Ed.) pp. 582, 583, and 584, and cases cited in notes. Moreover, this clause of the contract unquestionably stipulates for demurrage for the inexcusable delays—the delays caused by the acts or omissions of the car

company—and this fact is conclusive proof that the parties did contemplate a possible breach of the agreement when they made it.

While the word "but," which opens the damage clause, ordinarily expresses antithesis, it is not of such paramount importance or significance as to dominate or seriously influence the decision of the grave question here at issue. Nor have we been able to find anything in the fact that this stipulation closes with the words "after the said April 1st, 1900," decisive of this question. So far as we are able to discover, the contract would have the same meaning without these words that it has with them. In other words, they are demonstrably tautological, and have no legal effect, whether the construction asserted by the plaintiff or that maintained by the defendant is given to the contract. This fact is demonstrable by assuming that the postponement of the time of delivery by the excusable delays was one month, or until May 1, 1900. Then "the time specified," according to the railway company's contention, would be the time between December 19, 1899, and April 2, 1900; and, according to the car company's contention, it would be the time between December 19, 1899, and May 2, 1900. Insert this time in the stipulation for demurrage in the place of the words "the time specified," and omit the term "after the said April 1st, 1900," and it will read:

"But it is agreed that in the event of the failure of the party of the first part to make and deliver the cars aforesaid within the time between December 19, 1899, and April 2, 1900 [as the railway company insists] or within the time between December 19, 1899, and May 2, 1900 [as the car company maintains], then it shall forfeit and pay to the party of the second part as liquidated damages consequent upon such failure the sum of five dollars per day for each car so delayed."

It is clear that there could not be any liability on the part of the car company for demurrage under this stipulation prior to April 2, 1900, under either construction, because by the preceding part of the contract the railway company agrees that the plaintiff shall have until April 2, 1900, to make its deliveries, and because the clause providing for the demurrage stipulates for none prior to that date, whether the interpretation of the plaintiff or that of the defendant is adopted. Now, add to the clause the words "after the said April 1st, 1900," and they add nothing and take nothing away from its legal effect or significance under either construction, because, in the absence of these words, damages for demurrage prior to April 2, 1900, are no more recoverable than in their presence. The word "so," before "delayed," about which much was said upon the argument, is in the same category. The cars "so delayed" are those delayed in the time and manner stated in the preceding part of the agreement. If "the time specified" is the time prior to April 2, 1900, as the railway company insists, then the cars "so delayed" are those delivered after April 1, 1900. If, on the other hand, "the time specified" is, as the car company contends, the time prior to May 2, 1900, then the cars "so delayed" are those that are not delivered until after May 1, 1900. After all is said, the meaning of the term "the time specified" conditions the determination of the whole question; and

the words "but," "so," and "after the said April 1st, 1900," give no clear indication of its true interpretation.

It is said that "within the time specified" must mean the time anterior to April 2, 1900, because that is the only exact, specific time mentioned in the portion of the agreement preceding the stipulation for damages. But to specify is to mention specifically, to name distinctly, and the fact that the delivery of the cars on or before April 1, 1900, was to be subject to the delays caused by the unavoidable contingencies stated in the contract, and hence that the time of delivery was to be extended thereby, was as specifically mentioned and as distinctly named in the earlier part of the agreement as was the date of April 1, 1900. It was a distinctly stated and clearly specified part of the contract preceding the damage clause that the time within which the car company might lawfully deliver the cars was the time prior to April 2, 1900, plus the time it might be delayed by the unavoidable contingencies. The words "the time specified" refer back to the time during which the cars might be delivered under the preceding paragraph of the agreement, and there is nothing in the word "specified" or in its definition to restrict the signification of the term under consideration to one part, or to exclude another part of the time distinctly named in the earlier paragraph of the contract. On the other hand, when by the foregoing paragraph of the agreement the stipulation had been made that the cars might be delivered within the time prior to April 2, 1900, plus the time the car company might be delayed by the specified acts beyond its control, and the parties went on in their agreement to say that, if the car company failed to make the delivery "within the time specified," it should "forfeit and pay to the party of the second part as liquidated damages consequent upon such failure five dollars per day for each and every car so delayed," the natural and rational inference was that the time specified was all the time within which the parties had agreed that the delivery might be made, and not a part of that time.

It is unquestionably true that the car company had the right to deliver, and that the railway company obligated itself to accept the delivery of, these cars within any time after April 1, 1900, to which the delivery might be postponed by the excusable delays mentioned in the agreement; and there is great force in the argument of the counsel for the railway company that it is unreasonable to suppose, and is improbable, that the defendant would have made this obligation, and would have subjected itself to the certain losses consequent upon these delays, without a corresponding obligation on the part of the company to indemnify it against them. But when the entire contract, the situation of the parties, the surrounding circumstances, and the terms of the agreement are thoughtfully considered, this argument is more than overcome by the following considerations: The car company was certainly unwilling to agree to deliver the cars on or before April 1, 1900. It was unwilling to take the chances of the losses on account of the delays in the manufacture and delivery that might be caused by the unavoidable contingencies named in the agreement. It therefore demanded and secured from the railway company a stipulation that it might deliver, and that the defend-

ant would receive, these cars after April 1, 1900, during the time that their delivery might be delayed on account of the specified contingencies. It demanded and secured this stipulation for the purpose of relieving itself from the liability for damages which it might incur if, without this agreement, it was prevented by matters beyond its control from making its deliveries by April 1, 1900. In the face of this fact, is it reasonable to suppose, is it probable, that at the same time that it insisted upon and obtained this stipulation to relieve itself from possible damages that might accrue from its failure to deliver on account of these possible delays, it also agreed to pay to the railway company $2,000 per day for every day that the delivery of the cars might be postponed by the happening of these unavoidable contingencies, and a proportionate amount for the like postponement of the delivery of every car? A negative answer seems to be the more rational reply to this question. An agreement by a party to pay damages for events beyond its control, against which it has already stipulated, is certainly an unusual contract, out of the ordinary course of business, and unlikely to be made by a party of ordinary prudence and sagacity. Moreover, the stipulation under consideration is for the forfeiture and payment of damages for the failure of the car company to deliver within the specified time. The words "failure," "damages," and "forfeit" all point, not to a stipulation whereby a new liability is created, but to one in which the indemnity against injury that is likely to result from the failure to perform a stipulation already made is measured. They are words commonly used, and naturally applicable to the treatment of defaults within the control of the party who undertakes to forfeit and pay the damages. The damages one pays or agrees to pay usually consist of indemnity for injuries caused by his own breach of duty or of contract, and not to losses which another sustains from events over which the former has no control. In the ordinary course of business, the failures for which one forfeits and pays, or agrees to forfeit and pay, damages, are generally those resulting from his own fault or negligence, not those caused by unavoidable contingencies against liability, for which he has already stipulated. There were or there might have been inexcusable delays in the delivery of these cars, to which the words under consideration fitly apply; and there is nothing in the agreement, the situation, or the circumstances of the parties to persuade that they used, or intended to use, them in any extraordinary or unusual sense.

While the question is not free from difficulty, the fact that in the first part of this agreement these parties contracted that the car company might deliver, and the railway company would accept, the cars within the time prior to April 2, 1900, plus the time after April 1, 1900, within which the delivery might be delayed by the unavoidable contingencies described in the agreement, the fact that it is unusual for one to agree to pay damages for losses caused by events over which he has no control, and against which he has stipulated, while it is customary for one to promise to pay liquidated damages for losses caused by his own breaches of duty or of contract, and the fact that losses of the latter character, to which the stipulation

for damages in this agreement may well apply, were possible and were probably contemplated by the parties when the contract was made, the fact that the more natural and rational application of the words "failure," "damages," and "forfeit and pay," in the stipulation wherein the car company agrees to forfeit liquidated damages for its failure to deliver the cars, is to a measurement of the damages for a failure to perform the agreement to deliver, already recited in the earlier part of the contract, and not to a stipulation to create a new liability for the excusable delays against which the company had already stipulated; and the fact that the term "the time specified," during which there could be no failure under the damage clause, does not specifically except any, but naturally includes all the time specified for the delivery of the cars in the foregoing paragraph of the contract (that is to say, all the time prior to April 2, 1900, plus the time after April 1, 1900, during which the delivery might be delayed by the unavoidable contingencies)—all these facts, and the considerations and arguments they suggest, converge with compelling force to persuade that the parties to this agreement never intended to contract that the car company should pay the damages stipulated in the agreement for the time during which the deliveries were delayed by the unavoidable contingencies against which it stipulated, but that their intention was that the agreement for liquidated damages should apply only to delays beyond the time within which the car company was bound to deliver the cars under the earlier paragraph of the contract. This construction evolves a more reasonable and probable agreement than that for which the railway company contends, and the subject-matter of the contract, the situation and surroundings of the parties when they made it, the terms of the damage clause, and a consideration of all the stipulations of the agreement together, furnish cogent arguments in support of it. Our conclusion, therefore, is that the car company was not liable, under the contract, to pay the liquidated damages for which it stipulated during the time within which it was permitted to deliver the cars under the first part of the contract, but that its agreement was to pay those damages for all the time during which any of the deliveries were postponed by its own act, neglect, or default.

It is assigned as error that the court rejected testimony offered by the car company to show that the parties themselves construed the contract as we have interpreted it. But it is unnecessary to consider the question raised by this assignment, because the conclusion already reached necessitates a reversal of the judgment, and because by a consideration of the agreement itself we have reached the result which the evidence was offered to attain.

It is contended that the court erred because it refused to instruct the jury that the provision of the contract for the payment of the $5 per car for every day that the cars were delayed after the time specified was a stipulation for a penalty, and not for liquidated damages, and that, as no actual damages had been proved, the railway company was entitled to no allowance for the delay in the delivery of the cars, whether it was caused by the car company or otherwise. But where it is certain that some damages will result if there is a

delay in the performance of an agreement, where those damages are incapable of exact ascertainment, or are based upon matters that are to a considerable degree uncertain, and where the amount stipulated is not, on the face of the contract, out of all proportion to the probable loss, an agreement to pay a sum certain for each day, week, or other definite period of delay beyond the time fixed by the contract for its fulfillment is a valid and enforceable contract for the measurement of the damages, and not an agreement for a penalty for nonperformance. Burk v. Dunn, 55 Ill. App. 25, 29; Story's Eq. Juris. § 1318; Fletcher v. Dyche, 2 Durnford & East, 32, 36; Ward v. Hudson River Building Co., 125 N. Y. 230, 235, 26 N. E. 256; Harris v. Miller (C. C.) 11 Fed. 118, 122. It was reasonably certain that the railway company would sustain losses by the failure to deliver the cars at the opening of the season, when they were desired and could be used. It was uncertain what the amount of those losses would be. They would be conditioned by the contracts of the railway company, the amount of ore that would be offered for transportation, the demand, the supply, the general commercial prosperity, and many other facts and considerations which could not be fully anticipated. The parties to the contract stood on an equal footing, each represented by trained and intelligent men—each better equipped to measure the probable injuries which the railway company would suffer than any court or jury is likely to be. They deliberately agreed that the standard for the measurement of the damages occasioned by the losses of the railway company through these delays should be $5 per car for every day of inexcusable delay. This amount does not appear from the face of the contract to be greatly out of proportion to the actual damages which the defendant would be likely to sustain, and no reason occurs to us why the courts should interpose to relieve the parties to this contract from the obligations which they have deliberately assumed.

All the evidence offered by the car company for the purpose of proving the fact that the delays in the deliveries of the cars were caused by the unavoidable contingencies named in the agreement was rejected by the court below on the ground that the car company was liable, under its construction of the contract, to the same extent, for the excusable as for the inexcusable delays. This, as we have seen, was, in our opinion, an erroneous view of the signification of the agreement. Counsel for the railway company now contend that, notwithstanding the fact that this testimony was ruled out for this wrong reason, yet this error furnishes no ground for a reversal of the judgment, because it was properly rejected on the ground that it shows upon its face that all the delays were caused by the fault or negligence of the car company. But this objection to this evidence was not made at the trial. The question whether or not it proves that the delays were caused by the unavoidable contingencies or by the negligence of the car company was not considered, tried, or ruled by the court below. Moreover, the car company was not called upon at the trial to present or offer all the evidence which it may have had upon this issue, because the court refused to receive any of this evidence, upon the ground that it was all immaterial un-

der its interpretation of the agreement. The plaintiff may or may not have evidence upon this issue which it did not offer at the trial below. However that may be, it has never had a trial, or an opportunity to try, a ruling, or a decision of the issue whether the delays in the deliveries of the cars were caused by the unavoidable contingencies or by its own fault; and, until it has had such a chance, this court cannot lawfully determine, and ought not to decide, that question. The jurisdiction of this court in an action at law is limited to the correction of the errors of the court below. That court has not yet considered, tried, or ruled upon the issue here presented; and therefore there is nothing in its action regarding it for this court to consider or determine, and its discussion and decision of this issue must be deferred until there has been an opportunity to try it, and a trial of it, in the Circuit Court.

The railway company complains of the trial below because the court instructed the jury (1) that in view of the fact that April 1, 1900, fell on Sunday, the car company was not in default in the delivery of the cars until the end of April 2, 1900; and (2) that, in calculating the damages for the failure of the car company to deliver the cars within the time specified, they were not to count any Sunday as a day, within the meaning of the damage clause of the contract. When the last day within which a deed is to be performed falls on Sunday, that day is excluded, and the act may be done on the succeeding day. Street v. United States, 133 U. S. 299, 306, 10 Sup. Ct. 309, 33 L. Ed. 631; Hammond v. Ins. Co., 10 Gray, 306; Post v. Garrow, 18 Neb. 682, 26 N. W. 580; Gen. St. Minn. 1894, § 5222; Spencer v. Haug, 45 Minn. 231, 232, 47 N. W. 794. There was therefore no error in the first of these instructions. As much cannot be said of the second, however. The stipulation for liquidated damages is not, as counsel for the car company argue, an agreement to pay $5 for the use of each car each day during the delay, and hence void as to Sundays, because there could be no lawful use, and therefore no legal loss of use, upon those days. On the other hand, it is a contract whereby the parties establish and agree to apply a specified standard to the measurement of damages that are uncertain and incapable of accurate determination. They agree that these unliquidated damages for the delay of the delivery of each car shall be measured by multiplying $5 by the number of days the delivery is delayed beyond the time specified. The agreed standard is $5 for every day's delay of each car. The contract would not have been essentially different if it had fixed the standard at $35 for each week's delay, or at 20 cents for each hour's delay, in the delivery of each car. It would be as reasonable to exclude one-seventh of the week, or the hours of Sunday, in a measurement by such standards, as it would be to exclude Sunday where the standard of measurement is 24 hours or a day. In the computation of rents, interest, damages, or any other amounts in which the day, the week, the month, or any other fixed period of time, is the agreed standard of measurement, every intervening Sunday, as well as every secular day, must be included and counted in the reckoning. The contract of these parties was that the car company would pay to the railway company "five

dollars per day" for every car delayed, and this was an agreement that the amount of damages for each car's delay should be the product of $5 by the number of days, including both Sundays and secular days, that the delivery of the car was delayed beyond the time when it was due by the terms of the agreement.

The judgment below is reversed, and the case is remanded to the Circuit Court for further proceedings not inconsistent with the views expressed in this opinion.