**RICHARDSON et al. v. WESTERN OIL, COAL & INVESTMENT CO. et al.** *

(Circuit Court of Appeals, Eighth Circuit. December 30, 1924.)

No. 6733.

**1. Mines and minerals ⬗36—Public oil lands can be acquired only by compliance with placer mining laws.**

Title to oil lands in the public domain may be acquired, under the statutes relating to placer mining locations (Rev. St. § 2329 et seq.; Comp. St. § 4628 et seq.), by filing a location certificate and performing the required annual assessment work, conditions requisite to later issue of patent.

**2. Mines and minerals ⬗5—Oil-leasing act held to permit leases only to holders of valid placer locations.**

The provisions of Leasing Act Feb. 25, 1920 (Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ss), relating to the leasing of public oil lands, particularly section 18 (Comp. St. Ann. Supp. 1923, § 4640¼i), held to permit leases only to those persons who hold existing valid locations.

**3. Mines and minerals ⬗43—Patent held to cut off rights of claimants to oil lands.**

All rights that might be claimed by virtue of placer locations of public oil lands, under Rev. St. § 2329 et seq. (Comp. St. § 4628 et seq.), were cut off by the issuance to others of a patent for such lands, and where such patent antedated Leasing Act Feb. 25, 1920 (U. S. Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ss), no rights under the latter act could be predicated as against the patentees or their successors in interest because of such locations.

**4. Mines and minerals ⬗27(4)—Contract between rival claimants contemplating lease from government held to entitle plaintiff to royalties only in lands to which it had a valid existing claim.**

A contract between rival claimants of public oil lands under placer locations, in the nature of a compromise and settlement, contemplating lease from government under Leasing Act Feb. 25, 1920 (Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ss), of several quarter sections of land, construed, and held to entitle plaintiff to royalties only on those lands described in the contract in which plaintiff had a valid existing interest prior to the contract, and not to require defendant to pay stipulated royalties on patented lands, nor on unpatented lands other than as specifically agreed.

**5. Contracts ⬗154—Will not be given unreasonable construction contrary to intent of parties.**

A contract will not be given an unfair and unreasonable interpretation in contravention of the clear and manifest purpose and intention of the parties.

Appeal from the District Court of the United States for the District of Wyoming; John Foster Symes, Judge.

*Rehearing denied April 1, 1925.

Suit by the Western Oil, Coal & Investment Company and others, against Emile Richardson and others. Decree for plaintiffs, and defendant named appeals. Reversed, with directions.

John W. Lacey, of Cheyenne, Wyo. (R. N. Matson, D. J. Howell, C. L. Rigdon, and Herbert V. Lacey, all of Cheyenne, Wyo., on the brief), for appellant.

Joseph C. Ewing, of Greeley, Colo. (Ray E. Lee, of Cheyenne, Wyo., Floyd E. Pendell, and Alfred R. Lowey, both of Denver, Colo., and R. M. Boeke, of Casper, Wyo., on the brief), for appellees.

Before LEWIS, Circuit Judge, and MUNGER and MILLER, District Judges.

LEWIS, Circuit Judge. Appellees sued appellant for a share of the royalties which they claim he was receiving from lessees on oil produced from certain lands in the Salt Creek, Wyoming, oil fields. Their claim is based on a written contract between one of the appellees, the Western Oil, Coal & Investment Company, hereinafter called Western Co., and appellant Richardson, of date January 10, 1921. The other appellee obtained from the Western Co. half of its interest in the contract.

The decree from which Richardson brought this appeal allowed appellees one-eighteenth of stated royalties on oil from eight quarter-sections; and Richardson's contention here is that as to seven of them the royalties named in the decree and in which the court gave appellees one-eighteenth interest were too large and greater than the contract provides for, and that as to the eighth, S. W. ¼ of Section 12, appellees are not entitled to hold appellant under the contract for any shares of royalties on oil therefrom. Both contentions turn on a proper construction of the contract between the parties.

[1] Title may be acquired from the United States to oil lands in the public domain by complying with the statute relating to placer mining claims (R. S. § 2329 et seq.; Comp. Stats. § 4628 et seq.), filing a location certificate and doing the required amount of annual assessment labor on the claim, as a condition to the later conveyance of title from the United States by patent.

The matters dealt with in the contract and the situation confronting the parties when it was made were these:

[2] (1) Locations had been made on these eight quarter-sections of public lands many years ago, many years before this

contract was made; in some instances they were superimposed, that is, the same quarter-section was located at different times by eight different persons, creating a conflict between locators under the respective locations, and none of them, except the S. W. ¼ of Section 12, had passed to patent; in some of these locations on the eight quarter-sections the name of Scott Morford appeared on the location certificates as one of the eight locators of each quarter-section; he died several years before the contract here sued on was entered into, and there is nothing in the record establishing that the locations in which his name appears as a locator had been maintained as valid locations, but to the contrary it appears from the record that persons claiming under other locations on the same quarter-sections were insisting that their locations were valid and existing; (2) in February, 1920, Congress passed the so-called Leasing Act, 41 Stat. 437 (Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ss), which provides in Section 18 (Id. § 4640¼i) that upon the relinquishment to the United States of all right, title and interest claimed and possessed prior to July 3, 1910, and continuously since by the claimant or his predecessor in interest under the pre-existing placer mining law to any oil or gas-bearing land upon which there had been drilled one or more oil or gas wells to discovery, and upon payment of a named royalty to the United States, the claimant, or his successor, if in possession of such land, undisputed by any other claimant prior to July 1, 1919, should be entitled to a lease thereon from the United States; and upon the delivery and acceptance of the lease, all suits brought by the Government affecting such lands might be adjusted. The Act clearly contemplated and provides that the lease should be given only to those who might hold an existing valid location, and it expressly authorized the Secretary of the Interior to determine that fact; it says:

"In case of conflicting claimants for leases under this section, the Secretary of the Interior is authorized to grant leases to one or more of them, as shall be deemed just."

[3, 4] The Act applied to the eight quarter-sections in controversy here, except the S. W. ¼ of Section 12, which, as said, had long been patented. Pursuant to the Act appellee, Western Co., applied for leases. Appellant Richardson also applied for leases. The Midwest Oil Co. and its three subsidiary companies applied for leases on six of the unpatented quarter-sections; and the Na-

tional Petroleum Co. applied for a lease on the other unpatented quarter, N. E. ¼ of Section 10; (3) the only right, title or interest in the lands that the Western Co. claimed, rested on deeds from Morford's heirs, which purported to convey a five-sixths interest of his undivided one-eighth interest in the locations which he and his seven associates had made on the seven unpatented quarter-sections. There is no basis whatsoever on which it may claim an interest in the patented S. W. ¼ of Section 12. United States patent for that quarter was issued October 2, 1893, on a placer location made in February, 1886, by W. S. Kennedy and seven associates. Morford was not one of them. Morford and seven associates did file a location certificate on the S. W. ¼ of Section 12 in May, 1887, but whatever rights Morford may have had under it were entirely cut off prior to his death by the patent. There is no claim that the patentee, Central Association of Wyoming, took title in trust for Morford. The Midwest Oil Co. also claimed Morford's interest in six of the quarter-sections through one Bowen, who obtained deed from the Morford heirs prior in date to the conveyance to the Western Co. It also claimed to own the interests of other locators, and it applied for leases on those six quarter-sections, pursuant to the Act. Appellant Richardson also claimed to own Morford's interest, or a part of it, through one Johnson, and he also claimed that he had acquired the interests of Morford's co-locators and the interests of conflicting locators. The Western Co.'s claim to five-forty-eighths interest in the Morford locations on the seven quarter-sections was subject to double attack, that Morford's locations had not been maintained as valid locations, and he had no interest,—if valid, that his interest belonged to the Midwest or to Richardson. These three parties, the Western Co., Richardson, and the Midwest Oil Co. and its subsidiaries, had put in applications for leases; the first claiming only five-sixths of Morford's undivided one-eighth interest in the seven quarter-sections, Richardson claiming that he owned the Morford interest and the interests of other locators, and the Midwest Oil Co., also claiming that it owned Morford's interest and the interests of other locators in the six quarter-sections on which it applied for leases; (4) on December 11, 1920, Richardson made a contract with the Midwest Oil Co. and its three subsidiary companies, wherein it is recited that Richardson claimed

to be the grantee of the Morford interest in the six quarter-sections, that the Western Co., one Mayfield, one Curry and one Lee also claimed to be owners of Morford's interest, or a part thereof, in the six quarter-sections, and it was agreed that when Richardson should obtain the withdrawal of the applications for leases of the Western Co., Mayfield, Curry and Lee, the Midwest Oil Co., in event it or its subsidiaries obtained leases, would create and assign to Richardson specified royalties on the gas and oil to be produced from the six quarter-sections during the terms of those leases, subject to deduction first of the royalties to be paid to the United States, as follows:

S. E. ¼ 11—40—79 1%
N. E. ¼ 14—40—79 1%
N. W. ¼ 24—40—79 ¾ of 1%
N. E. ¼ 23—40—79 ½ of 1%
S. W. ¼ 25—40—79 ½ of 1%
N. E. ¼ 27—40—79 ½ of 1%.

This was the situation on January 10, 1921, when Richardson's brother and his counsel, Western Co. and its counsel, and counsel for Mayfield, Curry and Lee met for the purpose of formulating agreements between them and Richardson in reference to their claimed interests and applications for leases. A general understanding had been reached theretofore as to the terms of the contracts concerning the six quarter-sections listed above, the Western Co. claiming five-sixths of Morford's one-eighth interest as locator in them, Mayfield, Curry and Lee claiming the remaining one-sixth of Morford's interest. It was the intention of all of them to deal only with those six quarter-sections. All knew that Richardson had made some agreement with the Midwest Oil Co. and its associate companies looking to an adjustment and settlement of the claims of the Western Co., and of Mayfield, Curry and Lee. Counsel for Richardson thereupon drew up a contract between Richardson and the Western Co. dealing only with the six quarter-sections and submitted it. No objections were made to it. It appeared to have been satisfactory and in accord with prior negotiations. But when the prepared form was submitted it occurred to counsel for the Western Co. that he wanted unpatented N. E. ¼ of Section 10 and patented S. W. ¼ of Section 12 brought into the contract; and the manner in which that was done, the phraseology used, some by counsel for Richardson and some by counsel for the Western Co., in tacking on to the prepared form additional provisions covering those two quarter-sections, is the basis from which this whole controversy springs.

Bearing in mind what has been said, we now take up that contract, herein sued upon. It bears date January 10, 1921. It designates the Western Co. as party of the first part and Richardson as party of the second part. It recites that the party of the first part had theretofore filed in the General Land Office application for leases or permits under the Act of February 25, 1920, in which it claimed a fractional interest in the lands described therein, arising out of an alleged five-sixths portion of an asserted locator's interest originally standing in the name of Scott Morford, such interest being claimed by reason of alleged conveyances from three of Morford's heirs; that the party of the second part claims all the interest of said Morford as locator, as his grantee; that the Midwest Oil Co. and its three named associate companies, or some of them, had also filed applications for leases, which applications were in conflict with the applications of the parties to the contract, all of said applications being for leases on the six quarter-sections, to wit:

S. E. ¼ 11—40—79
N. E. ¼ 14—40—79
N. W. ¼ 24—40—79
N. E. ¼ 23—40—79
S. W. ¼ 25—40—79
N. E. ¼ 27—40—79;

that the parties to the contract had agreed upon a settlement and compromise of all of their said conflicting claims and that upon consideration thereof the party of the first part agreed to file in the General Land Office a withdrawal of its application for leases; that the party of the first part would hold the party of the second part harmless against all claims whatsoever in said lands of Rachael Morford Young, Ida May Morford Mahnken and Walter Morford, heirs of Scott Morford, except as to transfers to one Allan Bowen and his successors in title; in consideration thereof the party of the second part agreed that he would pay to the party of the first part $2,500.00 in cash, the receipt of which was acknowledged. The contract as originally drafted and as executed then proceeds:

"In further consideration of the agreements of the party of the first part the party of the second part hereby undertakes and agrees that as to said six quarter-sections of land first hereinabove described the party of the first part shall have an undivided ¹⁄₄₈th interest of any royalty, interest, ben-

efit, emolument or compensation secured in any contract of adjustment or compromise between said party of the second part, and said Midwest Oil Co. and other conflicting claimants and a like interest secured through direct lease from the government or by indirection or otherwise in said Morford locator's interest by reason of the withdrawal of said application or other disposition thereof, and that with the consent of the Secretary of the Interior he will upon its request assign unto the party of the first part such fractional interest in any royalty or other interest so secured by said party of the second part."

When counsel for the Western Co. asked that the N. E. ¼ of Section 10 and the S. W. ¼ of Section 12 be included in the contract, it was so changed as to embody an additional recital in its fore-part that the parties to the contract had each filed applications for leases on those two quarter-sections and that other applications for leases on them had been filed, and immediately following the above quotation from the contract this was inserted in reference to those two quarter-sections:

"And that as to the N. E. ¼ of Section 10 and the S. W. ¼ of Section 12 hereinbefore described the party of the first part shall be entitled to and shall receive the same interest that it receives under the terms of this contract for the highest royalty or other interest secured by compromise or otherwise on any of the six quarter-sections herein described, and in the event that no interest whatsoever shall be received by the said party of the second part in any of the aforesaid six quarter-sections, and the said second party shall receive an interest in some portion or portions of the said N. E. ¼ of Section 10 and the S. W. ¼ of Section 12, in consideration of the withdrawal and termination of the application of the party of the first part for leases herein, the party of the first part shall receive an undivided one-eighteenth interest in any interest of said second party so secured, such royalty or other interest to cover and apply to only the portions of said N. E. ¼ of Section 10 and S. W. ¼ of Section 12 in which said second party shall secure an interest."

On the same day, December 11, 1920, that Richardson made the contract, hereinabove noted, with the Midwest Oil Co. and associate companies looking to a settlement and adjustment of the claims of Western Co., Mayfield, Curry and Lee as claimants of Morford's interests as locator, he made another contract with the Midwest Oil Co. and its associates, wherein, after naming Richardson as party of the first part and the Midwest Oil Co. and its three associate companies as parties of the second part, it was recited that the party of the first part had filed applications for leases on eighteen named quarter-sections, six of which were the quarter-sections named in his other contract with those companies; the N. E. ¼ of Section 10 and the S. W. ¼ of Section 12 were not named therein; that the parties, or some of them, of the second part had also filed applications for leases on said eighteen quarter-sections; that the parties had agreed upon settlement and compromise of their conflicting claims, and that in consideration of their mutual agreements the party of the first part agreed to file in the General Land Office separate withdrawals of his applications, or if desired by the parties of the second part he would prosecute them, and if he received leases he would assign them to the parties of the second part; that the party of the first part would save the parties of the second part harmless against those claiming through eleven named persons who, it appears, were locators upon the described lands, some of them being the seven associates of and co-locators with Morford on some of the six quarter-sections described above, and some who were not co-locators with him; in consideration therefor the parties of the second part agreed that if and when they obtained leases on the described lands they would create and assign to the party of the first part a specified per cent. royalty on the oil to be produced from each tract, the highest amount on any of the said six quarter-sections being 8 per cent. and the lowest 4½ per cent. It is to be observed that the royalties to be allowed to Richardson in this contract were based solely on the claimed interests derived from locators other than Morford. It does not mention Morford or those claiming interests under him in any of the locations. But in view of this contract plaintiffs made claim below that they were entitled to one-eighteenth of the per cents. of royalties named in both contracts with the Midwest Oil Co. on the six quarter-sections, and also to the highest per cents. of royalties named in both contracts on any of the six quarter-sections; in the oil to be produced from the N. E. ¼ of Section 10 and the S. W. ¼ of Section 12; to which the court below acceded and gave decree accordingly. We think it is obviously and entirely erroneous. The

part of the contract first quoted above is explicit that the Western Company's share of the royalties on oil from the six quarter-sections was to be one-eighteenth of the benefits to be secured by Richardson in any contract between him and the Midwest Oil Co. in (in virtue of) "said Morford locator's interest." The benefits secured to Richardson in his contract with the Midwest Oil Co., referred to in his contract with the Western Co., are the per cents. of royalties in the six quarter-sections, extending from one-half of one per cent. to one per cent., and they were secured by him, as that contract clearly shows, in virtue of said Morford locator's interest. As to the six quarter-sections first described in the contract with the Western Co., we think the language used by the parties can have but one meaning, that the Western Co. contracted for and is entitled to receive from Richardson one-eighteenth of the per cents. of royalties in oil produced from those six quarter-sections as scheduled above, extending from one-half of one per cent. to one per cent. Those six quarter-sections were the first quarter-sections described in the contract with the Western Co.

As to the N. E. 1/4 of Section 10, Richardson has never made a contract with the Midwest Oil Co. and its associates in relation thereto. Some time after January 10, 1921, he did make a contract with the National Petroleum Company in consideration of Morford's interest as a locator on that unpatented quarter-section, whereby he secured to himself from that company, which became lessee, 1 1/2 per cent. royalty on oil to be produced under its lease, and he has at all times conceded to and offered to pay to appellees one-eighteenth of that 1 1/2 per cent., as well as one-eighteenth of the per cents. named in the contract with the Midwest Oil Co. which he secured to himself in consideration of Morford's interest as a locator.

As to the patented S. W. 1/4 of Section 12, Richardson never secured or received from anyone in any compromise or settlement in relation thereto any benefits or royalties on the oil to be produced therefrom and has no share or interest therein; and he is in no way obligated to appellees under the contract in respect thereto.

[5] Even if the terms of the contract sued on were not plain the contentions of appellees could not be sustained. To do so would give to the contract an unfair and unreasonable interpretation and be in contravention of the clear purpose and manifest intention of the parties. When all of its parts are read and weighed together and the facts and surrounding circumstances under which it was made are considered, the conclusion which we have reached seems to us unavoidable. The only consideration to Richardson for a share in royalties which he might receive was a waiver by the Western Co. of its claim to Morford's rights as locator. It had no interest in the rights of any other locator. In the absence of a definite and express agreement by Richardson to give the Western Co. a share in royalties which he might secure in adjustment or compromise of rights which he claimed under other locators, it is not fair, just or reasonable that it should have any share in those royalties so secured by him; and there is no express agreement that it should share in them. O'Brien v. Miller, 168 U. S. 287, 297, 18 S. Ct. 140, 42 L. Ed. 469; Pressed Steel Car Co. v. Eastern Ry. Co., 121 F. 609, 57 C. C. A. 635; A. Leschen & Sons Rope Co. v. Mayflower G. M. & R. Co., 173 F. 855, 97 C. C. A. 465, 35 L. R. A. (N. S.) 1; Hendricks v. Webster, 159 F. 927, 87 C. C. A. 107.

The decree will be reversed at the costs of appellees, with instructions to set it aside and to enter a decree in favor of appellees adjudging that they are entitled to one-eighteenth share in royalties on oil produced and to be produced from six quarter-sections under leases to the Midwest Oil Co. or its associate companies (after deducting royalties payable thereon to the United States), as follows:

| | | | |
|---|---|---|---|
| S. E. 1/4 | 11—40—79 | 1% | royalty |
| N. E. 1/4 | 14—40—79 | 1% | " |
| N. W. 1/4 | 24—40—79 | 3/4 of 1% | " |
| N. E. 1/4 | 23—40—79 | 1/2 of 1% | " |
| S. W. 1/4 | 25—40—79 | 1/2 of 1% | " |
| N. E. 1/4 | 27—40—79 | 1/2 of 1% | " |

and also adjudging that they are entitled to one-eighteenth share in royalties on oil produced and to be produced from the other quarter-section under lease to the National Petroleum Company (after deducting royalties payable thereon to the United States), as follows:

N. E. 1/4  10—40—79  1 1/2% royalty,

and that Richardson be adjudged to pay appellees all sums past due, but without interest.

We have considered the case on appeal as against Richardson alone. Seven oil companies were named with him as defendants. Only one of them, the Consolidated Royalty

Oil Company, joined with him in this appeal. The decree purports to hold the last-named company with Richardson for the interest in royalties claimed by the Western Co. on oil produced from the S. W. ¼ of Section 12 and the N. E. ¼ of Section 10. We have eliminated the S. W. ¼ of Section 12; and no reason has been assigned for holding the Royalty Company with Richardson for payment to the Western Co. of its share of the royalties on oil produced from the N. E. ¼ of Section 10. Before the suit was brought Richardson made repeated tenders of amounts that had accrued and were due to appellees, and he asserts here his readiness to pay all future sums that may accrue. It will be time enough to seek relief against him through others when he fails to meet his obligations. The decree to be entered will order a dismissal of the case against the Consolidated Royalty Oil Co. However, that part of the decree appealed from which made provision that the lessees of the seven unpatented quarter-sections should pay to appellees the shares in the respective amounts of royalties to which they are herein found to be entitled may be retained, and such payments when made shall to that extent discharge Richardson.

It is so ordered.